FILED
APR 1 5 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LARRY D. TALLACUS,                                        Civ. No. 08-591-AC

                     Plaintiff,                       OPINION AND
                                                ORDER

     v.

KATHLEEN SEBELIUS, Secretary,
Department of Health and Human Services,

                     Defendant.

_____

ACOSTA, Magistrate Judge:

### Introduction

     Plaintiff Larry D. Tallacus ("Tallacus") alleges six claims against Defendant Kathleen

Sibelius, the Secretary of the Department of Health and Human Services ("Defendant"). The claims

specifically concern a Reduction in Force ("RIF") action taken by the Indian Health Services ("IHS" or "the Agency") at its Portland, Oregon office. Tallacus alleges that he was retaliated against for engaging in protected activity, in violation of 42 U.S.C. § 2000e, et seq. ("Title VII"). Tallacus alleges three claims arising from discrimination based on age, sex, and disability, in violation of Title VII. Tallacus also seeks judicial review of the administrative determination that the Agency's personnel action, the RIF, was lawful. Finally, Tallacus alleges that the RIF was contrary to the terms of an earlier settlement agreement and, therefore, amounts to a breach of contract.

Currently before the court are Defendant's motion to dismiss the breach of contract claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and for summary judgment on all other claims pursuant to Rule 56(b). FED. R. CIV. P. 12(b)(1), 56(b). Judicial review of the personnel action and the decision of the Administrative Law Judge ("ALJ") will be limited to the contents of the administrative record.[1]

*Factual Background*

The factual background applicable to judicial review of the administrative action derives solely from the administrative record before the ALJ at the time of the administrative hearing. The factual background that the court may consider with respect to the discrimination claims includes, additionally, evidence collected during discovery in this federal action.

I.    Facts from Administrative Record

Tallacus has been employed by IHS since 1988 in the Contract Health Services ("CHS") division. In 1997, Tallacus filed a claim against IHS under Title VII. On October 27, 2000, Tallacus

---

[1] In a declaration, Daniel F. Mendoza certifies that "the documents attached to this declaration are true and correct copies of the administrative record that was before the Merit Systems Protection Boards." (Mendoza Declaration ("Decl.") at 2.)

OPINION AND ORDER                    2                    {KPR}

entered into a settlement agreement with then Secretary of Health and Human Services, Donna Shalala. The agreement provided, in relevant part, that Tallacus would receive a cash settlement, attorney fees and costs, and a new position at IHS with additional duties bearing the title "Contract Health Service Consultant/Officer" or "CHSO." (Administrative Record ("AR") 9.) The written agreement did not explicitly address under what conditions Tallacus's position could be eliminated or Tallacus himself could be terminated.

At the time the settlement was reached, Donalda Wilder ("Wilder") had just begun working at IHS and was involved in the settlement negotiations. Wilder made a statement to Tallacus to the effect that he should work hard because of the monetary award he had received. She also stated that his position would likely be subject to an RIF in the future, because an increasing number of tribes were taking on the duties that make up his position as CHSO. In 2003, Wilder again commented to Tallacus, this time privately, that he would likely be subject to an RIF in the future. In 2005, Tallacus saw an executive committee agenda which stated that his position would be discussed as one that could potentially be eliminated via an RIF.

The record contains a copy of the "Management Control Self-Assessment for Contract Health Services for FY 2007." (AR 366-76.) The assessment was prepared by Tallacus and signed off on by Wilder. (AR 372, 366.) The document asked: "Are the AO's FTE, PD & PAS appropriate to the responsibilities & functions related to CHS program?" (AR 373.) The assessor or assessors answered that, yes, the "FTE" was currently appropriate, where FTE stands for "full time equivalent" and refers to a full time position, or its equivalent. The document does not bear a specific date, though it generally refers to fiscal year 2007. An accompanying letter was sent out with the assessment, dated April 26, 2007. (AR 365.) On August 30, 2007, Tallacus received notice of an

RIF from DHS. The notice stated:

> This RIF results from the contracting of Contract Health Service (CHS) and transfer
> of fiscal allocation to the tribes under the authority of the Public Law 93-638. . . . In
> FY-06, two (2) Portland Area tribes compacted or contracted their CHS programs
> and associated shares. The Portland Area now directly operates CHS Programs for
> only 5 (out of 43) tribes in the entire Area and three (3) of those are tribes of 200
> individuals or less. Therefore, your position can no longer be a full time CHS
> Consultant, therefore a[n] RIF action has to be conducted.

(AR 15.) The notice further provides that Tallacus would be reassigned to the position of

Accounting Technician in the Division of Financial Management. Despite the fact that the new

position was at a lower pay grade, Tallacus was to "retain [his] current grade, step, and pay for a

period of not to exceed two years," though he was eligible to retain his pay grade at the end of two

years. (AR 16.)

Tallacus requested an appeal of this agency action by the Merit Systems Protection Board

("MSPB"), on December 4, 2007. (AR 2.) In this application, Tallacus argued that the agency had

acted in violation of the earlier settlement agreement. He also argued that the need for a CHS

program and the resources available for such a program were sufficient to require and fund the

position he lost through the RIF. As relief, Tallacus sought reinstatement to the position described

in the 2000 settlement agreement, a promotion, and payment of attorney fees. (AR 3.) Tallacus also

filed a discrimination complaint with the Equal Employment Opportunity Office on September 7,

2007, alleging discrimination based on gender, age, disability, and retaliation for protected conduct.

(AR 45, 49-50.) He notified IHS of this complaint on October 4, 2007. (AR 53.) On January 3,

2008, Doni Wilder requested information about Tallacus's accrued sick leave and annual leave.

Tallacus had accrued a total of 212.5 hours of annual leave and 84 hours of sick leave in 2007. (AR

62.) The record reflects that these totals were within the total amounts of both annual and sick leave

to which Tallacus was entitled.  (AR 63.)    Tallacus filed this claim in federal court on May 15,

2008.

II.    Additional Facts in District Court Record

Tallacus received an 80% disability rating by the Veterans Administration.  (Tallacus

Deposition ("Depo.") 16:22 - 17:2.)  Due to difficulty walking, Tallacus requested accommodation

from CHS in the form of a parking spot.  *Id.* at 18:3-20:25.  After his request was initially denied,

Tallacus filed a formal complaint and received the accommodation in 1997.  Wilder admits that,

during the settlement negotiations that resulted in the 2000 settlement agreement, she warned

Tallacus of the possibility of an RIF of this position.  She also asked him what he would do for his

community to, in essence, justify receiving the settlement.  (Wilder Depo. 84:4-11, 22-24.)  Wilder

stated:

> [W]e had reached an agreement where he was going to receive a sum of money that
> would have otherwise provided healthcare to Indian people and I'm Indian and I
> worked my whole career for that, and I wanted to make sure that he understood I
> hope that he was going to [do] something good for the Agency that would make sure
> that the money was well spent.

*Id.* at 133:7-14.

Soon after the settlement agreement was signed, Wilder told Tallacus he would eventually

be subject to an RIF as a result of tribes opting to administer the program internally.  (Tallacus Depo.

103:7-22.)  When Tallacus was informed of the RIF, Wilder brought with her a copy of the

settlement agreement.  (Tallacus Depo. 84:4-19.)  She asked Tallacus if he thought this document

prevented the Agency from eliminating his position.  *Id.* at 85:16-22.  Tallacus has since testified that

he believed the RIF was a breach of this agreement because he was guaranteed his position so long

as there was a "CHS principal contact in the area office."  *Id.* at 90:21-91:20.

Subsequent to Tallacus's RIF, two health system specialist positions opened up, both at higher pay grades than Tallacus's current pay grade. Tallacus did not apply for either position. (Wilder Depo. 45:20-46:19.) It was Tallacus's view that if he applied for such a position, he would forfeit his right to assert the current cause of action. (Tallacus Depo. 69:8-24.)

Since his position was eliminated via the RIF, Tallacus has frequently been called on to help other employees perform his old tasks and spends approximately one hour per week doing so. (Tallacus Depo. 66:16-68:19.) Biery testified that she spends approximately five percent of her work day on CHS issues. (Biery Depo. 10:5-17.)

Leah Tom ("Tom") is the only IHS employee besides Tallacus who is disabled.

III.    Motions to Strike

    *A.*    *Fritz Deposition*

Defendant filed a motion to strike the deposition testimony of Phil Fritz ("Fritz") as inadmissible character evidence prohibited under Federal Rules of Evidence ("FRE") 404 and 608. Fritz testified that, in his opinion, Wilder tended to hold grudges and retaliate against people. FRE 404 states, in relevant part, that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion[.]" FED. R. EV. 404(a). Three exceptions are given, none of which are applicable here. FRE 608 provides that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation," but only to the extent the evidence addresses the witness's "character for truthfulness or untruthfulness." FED. R. EV. 608(a). Defendant argues that the testimony does not address Wilder's character for truthfulness or untruthfulness and is, in fact, offered only to prove that she acted in conformity with the alleged characteristics in conducting the RIF of Tallacus.

Therefore, Defendant argues, the evidence is inadmissible and should be stricken.

Plaintiff responds that the evidence speaks to the motives behind the RIF and is admissible under FRE 404(b), 405(a), and 608(a). As to FRE 404(b), Plaintiff claims that motive and intent are at issue in the context of a retaliation claim and, thus, the evidence is admissible under this rule. FRE 404(b) states that "[e]vidence of other crimes, wrongs, or acts" may be admissible to prove motive or intent. FED. R. EV. 404(b). As Defendant points out, Fritz does not testify about a crime, wrong, or action taken by Wilder. Rather, Fritz testifies only about his own belief or feeling that Wilder holds grudges and retaliates. Thus, the evidence is not admissible under this rule.

FRE 405 concerns methods of proof for establishing a person's character. It states, in relevant part: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion." FED. R. EV. 405(a). As Defendant points out, this rule concerns methods of proof and not admissibility and, thus, does not support the admissibility of Fritz's testimony. Finally, both parties cite FRE 608(a), which permits opinion or reputation evidence to establish a witness's "character for truthfulness or untruthfulness." FED. R. EV. 608(a). Fritz's testimony does not address Wilder's character as it relates to truthfulness or untruthfulness. Rather, the testimony speaks to Wilder's character as it relates to allegedly holding grudges and retaliation. This testimony is not admissible under Rule 608. For all of these reasons, the deposition of Fritz is stricken.

### B.    Defendant's Factual Background

Tallacus argues that the court should strike the Factual Background section of Defendant's memorandum. Tallacus cites Local Rule 56.1(c)(2) which provides that, in a concise statement of material fact, "[a] party may reference only the material facts which are necessary for the Court to

determine the limited issues presented in the motion for summary judgment and no others." *Local Rules of Civil Practice*, District of Oregon, LR 56-1(c)(2) (2009). According to Tallacus, there are thirty-seven references to the record that are not included in Defendant's concise statement, and these references should be stricken. Tallacus also cites Local Rule 56-1(e)[2] which states that "[e]xcept as otherwise required by law, when resolving a motion for summary judgment, the court has no independent duty to search and consider any part of the Court record not otherwise referenced in the separate concise statements of the parties." *Local Rules of Civil Practice*, District of Oregon, LR 56-1(e) (2009).

Defendant opposes the motion on several grounds. The court agrees with Defendant that the administrative record has, as a whole, been admitted into the record. Where a district court is called upon to review an agency's determination the court must "review the administrative record as a whole, considering the evidence that both supports and undercuts the agency's determination." *Pavlik v. United States*, 951 F.2d 220, 225 (9th Cir. 1991) (citing *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988)). Furthermore, Local Rule 56-1(c)(2) governs the content of the concise statement and does not speak to what is properly included in the parties' briefing. And, although the court does not have an independent duty to search the record outside of those citations included in the concise statement, the parties are not precluded from providing additional citations where the record supports their position. Ultimately, it is for the court to decide which facts are material. Although the court has no independent duty to search the record for evidentiary support to support a party's position, the court need not restrict its review to those facts referenced in the concise statement.

---

[2] The memorandum refers to subsection (d), but it is clear that Tallacus meant to cite subsection (e) to support this particular argument.

For these reasons, Tallacus's motion to strike is denied.

*Legal Standards*

I.    Dismissal for Lack of Subject Matter Jurisdiction

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject matter jurisdiction of the court." *Ahmed v. Scharfen*, No. C 08-1680 MHP, 2009 WL 55939, at *3 (N.D. Cal. Jan. 7, 2009) (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039-40 (9th Cir. 2003)).  This challenge to jurisdiction may be either facial or factual, depending on whether the motion relies only on the allegations of the complaint or if it relies on evidence extrinsic to the complaint as well. *See Savage*, 343 F.3d at 1039 ("In evaluating the rule 12(b)(1) motion to dismiss, the district court considered affidavits furnished by both parties.  This is proper because Rule 12(b)(1) attacks on jurisdiction can be either facial, confining the inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint." (citation omitted)).  Where the challenge is factual, the court "need not" presume true the allegations contained in the complaint. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  The party asserting jurisdiction bears the burden of establishing that it exists in a given case. *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-183 (1936)).

II.    Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008).  Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

OPINION AND ORDER                        9                        {KPR}

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.    Lawfulness of the Agency Action

A district court may take jurisdiction over a claim for judicial review of a MSPB decision

where it is coupled with certain additional claims of employment discrimination.  The Ninth Circuit

described this jurisdictional scheme succinctly in *Romain v. Shear*, 799 F.2d 1416, 1421 (9th Cir.

1986):

> Ordinarily, petitions for judicial review of MSPB action are filed in the Court of
> Appeals for the Federal Circuit and are reviewed on the administrative record.
> Where a claim of discrimination is coupled with a nondiscrimination claim, however,
> the entire "mixed case" is filed in the district court.  On the discrimination claim, the
> petitioner "shall have the right to have the facts subject to trial de novo by the
> reviewing court."  The nondiscrimination claim in a mixed case is, however,
> reviewed on the administrative record . . . .

(quoting 5 U.S.C. § 7703(c) (internal citations omitted)).  Therefore, the RIF will be reviewed based

on the administrative record only and those arguments before the ALJ at the time of administrative

review.

Tallacus alleges that the RIF's "bona fides," that is, the reasons given by the agency for that

agency action, are not supported in fact and, thus, the RIF was unlawful.  Defendant argues that the

RIF was justified by appropriate bona fides, both a lack of available work and a shortage of funds

and, thus, the agency action was consistent with the law.  Tallacus originally brought this claim

before the MSPB.  The ALJ upheld the agency's action.  The ALJ concluded that "the RIF was

conducted for a proper reason and the RIF regulations were properly invoked."  (AR 820.)

Tallacus is entitled to judicial review of the ALJ's decision.  5 U.S.C. § 7703(a)(1).  The

statute provides that the decision of the MSPB and must be upheld unless such action is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

OPINION AND ORDER                          11                                    {KPR}

the law;

(2) obtained without procedures required by law, rule, or regulation having been
followed; or

(3) unsupported by substantial evidence[.]

5 U.S.C. § 7703(c) (2009).[3] The court's role is to "review the findings to make sure the ALJ applied

the correct legal standards and review the entire record to insure that the findings are supported by

substantial evidence." *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (citing *Martinez v.

Heckler*, 807 F.2d 771, 772 (9th Cir. 1986)). "An ALJ's findings as to credibility are entitled to

considerable deference." *Washington v. Garrett*, 10 F.3d 1421, 1430 (9th Cir. 1993) (citing *Curran

v. Department of the Treasury*, 714 F.2d 913,195 (9th Cir. 1983)). However, where it is undermined

by "inherent improbab[ility]" or "undisputed fact," the ALJ's credibility should not receive

deference. *Id.* So long as it is supported by substantial record evidence, the ALJ's decision must

be upheld, even if there are other reasonable interpretations also supported by the record evidence

and even if the court itself may have concluded otherwise. *See Robbins v. SSA*, 466 F.3d 880, 882

(9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, we

may not substitute our judgment for that of the ALJ." (citing *Flaten v. Sec'y of Health & Human

Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).

A.    *Tallacus's Witnesses*

Tallacus argues that he was prejudiced by the ALJ's decision not to allow all of his proposed

witnesses to testify at the administrative hearing. According to Tallacus, the testimony of Tom

would have demonstrated that a substantial portion of her workload was taken up by his old duties

and the testimony of Denise Imholt ("Imholt") would have explained that tribal shares for eighteen

---

[3] Tallacus's discrimination claims were also addressed by the ALJ. These claims, however,
are subject to de novo review in district court and are addressed separately, below.

tribes were actually retained by the Portland office. However, beyond Tallacus's own conjecture, the court has no basis to conclude that the ALJ abused his discretion by limiting the number of witnesses Tallacus could present at the administrative hearing. The Court of Appeals for the Federal Circuit has noted that "[a] determination to allow or exclude witness testimony is within the sound discretion of the administrative judge." *Guise v. Dept. of Justice*, 330 F.3d 1376, 1379 (Fed. Cir. 2003) (citing *Tiffany v. Dept. of the Navy*, 795 F.2d 67, 70 (Fed. Cir. 1986)). In *Guise*, the plaintiff failed to make a specific showing that the ALJ's ruling "deprived [him] of important evidence and, thus, the court held that it was not an abuse of discretion." *Id.* at 1380. In this case, Tallacus similarly fails to establish that he was deprived of important evidence and, thus, the court defers to the ALJ's decision to exclude this testimony.

Tallacus's own "Witness List and Summary of Testimony" also supports the ALJ's ruling. Tallacus listed Imholt as a witness and stated that she "[would] be able to identify the tribes that have left their CHS Tribal Shares Retained." (AR 785.) Tallacus also refers to the spreadsheet that Imholt developed "showing which Area programs have CHS shares left and shares taken by each tribe for the Portland Area." *Id.* This spreadsheet was admitted into evidence and can be found at AR 203-204. Tallacus does not explain why Imholt's testimony was necessary or why the spreadsheet was insufficient to communicate the same information.

Tallacus also listed Tom as a witness and stated that she could testify as to an executive meeting that took place three days prior to the RIF, and to the fact that she was excused from the meeting so that the committee could discuss personnel issues. However, this information is contained in an emailed version of the meeting minutes sent by Tom to Leslie Dye ("Dye"), found at CAR 295. Tallacus also stated that Tom "can testify about the additional workload she received

from CHS . . . and maybe any conversations she had with Doni Wilder, pertaining to the added CHS workload and Ms. Wilder's response." (AR 786.) Tallacus references two exhibits, found at AR 209 and 241. The first is an email authored by Tallacus which outlines which CHS duties were to be handled by which IHS employee. The second exhibit is another email authored by Tallacus which states that Tallacus, Dye, Tom, and David Battese ("Battese") met to discuss distribution of the CHSO duties amongst those in the Office of Health Programs. The email goes on to note that the Agency "is continuing to hire" employees in other divisions. Again, Tallacus fails to explain how Tom's testimony, as characterized in the summary of testimony, deprived him of important evidence and was thus an abuse of discretion by the ALJ.

Tallacus submitted a subsequent declaration of Tom which indicates that she spends approximately eighty-five percent of her work day on CHS duties. This declaration was not part of the administrative record and its content cannot be considered in reviewing the propriety of the ALJ's decision. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, (1985) ("The task of the reviewing court is to apply the appropriate AP standard of review to the agency decision based on the record the agency presents to the reviewing court." (citations omitted)). Based on the administrative record, specifically Tallacus's "Witness List and Summary of Testimony," the court cannot conclude that the ALJ abused his discretion is excluding the testimony of Imholt and Tom.

### B.    Lack of Work

Defendant justifies the RIF that eliminated Tallacus's position as due to a lack of work that resulted from an increasing number of tribes opting to administer the CHS program internally. As more and more tribes opted to administer CHS's functions themselves, the Portland Area CHS had less and less work. Ultimately, the workload became so small that it no longer justified an FTE

position and, accordingly, Tallacus was subjected to an RIF. Defendant further points out that Tallacus was the only employee of the Portland area CHS and was therefore the only employee whose position could have been subject to the RIF. Furthermore, the remaining CHS duties were appropriately distributed among existing IHS employees.[4]

Tallacus responds that the adverse employment action and the reason for that action lack a rational nexus and, thus, the RIF was not legitimate. *See Curran v. Dept. of the Treasury*, 714 F.2d 913, 914 (9th Cir. 1983) ("Before the MSPB, it is the agency's burden to establish that the adverse action 'promoted the efficiency of the service.' This requires proof of a rational nexus between the adverse action taken and the agency's articulated reason for the action." (quoting 5 U.S.C. §§ 7701(c) and 7513(a); additional citations omitted)). First, Tallacus argues that Defendant's claim that the increase in tribes assuming their own CHS functions demonstrates a lack of work at CHS is a "red herring." In support of this argument, Tallacus cites the Management Control Self-Assessment for Contract Health Services for FY 2007. Tallacus contends that the FTE was specific to his position as CHSO and that by contracting out some of his duties to Colville, the agency did not change the fact that an FTE existed. Furthermore, Tallacus argues that the ALJ's finding is directly contrary to the FY 2007 assessment.

Tallacus argues that the ALJ incorrectly interpreted the meaning of this document. The ALJ wrote:

> The appellant contends that if there was not enough work to justify his position, the Assurance Statement should have responded "no." . . . Wilder testified that the Assurance Statements are to show that programs are being operated in accordance

---

[4] Defendant also argues that IHS followed proper procedures in performing the RIF. Tallacus does not claim that the RIF was procedurally deficient and, as such, the court will not address its propriety in this disposition.

with the law, policy and procedures. She stated that the assurance states that the FTE is appropriate, but that the FTE referenced is not tied to a specific position. She testified that appropriate FTE continued to work the CHS program.

(AR 820 (citations omitted).) The ALJ stated that "[a]n agency decision to eliminate an employee's position because the function can be performed by other employees . . . and or by contracting out . . . is legitimate." *Id.* (citing *O'Connell v. Dept. of Health & Humans Services*, 21 M.S.P.R. 257, 260 (1984) and *Kelley v. Railroad Retirement Bd.*, 20 M.S.P.R. 188, 189 (1984)). Based on the testimony in the record and the cited authority, the ALJ's conclusion is reasonable and supported by substantial evidence.

Tallacus admits that his old position was eliminated by the RIF, but argues that splitting up the duties between several other agency employees is the functional equivalent and, therefore, contrary to law. Tallacus also notes that, even if his duties did not add up to an FTE, the agency could have added duties sufficient to make it an FTE. Finally, Tallacus argues that Peggy Biery ("Biery"), who took on some of Tallacus's CHS duties, was not an existing employee at the time of the RIF; in fact, she has hired on November 11, 2007, several months after the RIF, which occurred on August 30, 2007.

Defendant argues that the ALJ specifically cited the testimony of Dye, who testified that Tallacus's duties have been absorbed by his office and those duties do not amount to an FTE position. The ALJ writes: "Captain Leslie Dye, Director of the Office of Health Programs, Portland Area, testified that his office absorbed some of the appellant's duties after the RIF. He testified that he handles appeals, Leah Tom handles CHEF matters and Battese handles transmissions. He denied that the absorbed work was sufficient to justify a fulltime equivalent position and stated that he and his two subordinates spend a combined two days per week performing the absorbed duties." (AR

818 (citations omitted).) The hearing transcript reveals that when asked to estimate how much time it took his office to perform Tallacus's previous duties, Dye stated that it would take "on average a couple of days a week for the whole shooting match." (AR 713.)

The administrative record contains emails authored by Tallacus wherein he complains of being unable to keep up with an overwhelming workload. The ALJ cited testimony of Tallacus's supervisor, Sharlene Andrew, who stated that "the back log of which [Tallacus] complained in his emails was comprised of claims work that would have been processed by the GS-5 claims clerk had that position been filled. It was not work that would normally be performed by the CHSO. That work was transferred to the Colville Service Unit." (AR 819.) This testimony is undisputed and is also supported by additional record evidence. *See* AR 406 (Wilder's email stating that the position of the clerk, Vern Foster, would not be filled and requested suggestions for completing his workload.); AR 593 (Wilder testifying that, as a result of Foster's departure from CHS, there was a backlog of work Tallacus had to temporarily assume, prior to it being transferred to Colville.). This represents substantial evidence that Tallacus's heavy workload was the result of the departure of his clerk and was not permanently associated with his position. Accordingly, emails tending to show that, for a period of time, Tallacus was overwhelmed with work do not detract from the Agency's conclusion that his position no longer constituted an FTE.

Tallacus argues at length that because Biery was not employed at the time of his RIF and now performs some of his former functions, she was hired for the purpose of doing his job. The facts do not bear this out. Biery is listed as an Information Technology Specialist on the IHS document identifying employees eligible for a VSIP. (AR 214.) Wilder testified that the duties that Biery performs that were formerly Tallacus's are not her "primary duties." (AR 613.) Dye testified that

Biery only performs CHS tasks when another employee is not around. *See* AR 713 ("She does the backup transition when David is not around[.]"). Accordingly, the fact that Biery performs some of Tallacus's former duties does not undermine the ALJ's conclusion that the RIF was lawful.

For all of the reasons stated, the court concludes that there is substantial evidence to support the ALJ's determination that the RIF was lawfully premised on a lack of work sufficient to justify an FTE for Tallacus's duties.

C.    *Shortage of Funds*

Tallacus further argues that the Agency did not lack funds to continue to fund his position and, therefore, its second claimed "bona fide" is also without basis. The Agency did not dispute that "there is funding in the Area that could support a full-time position, there is no[] requirement that the Area structure itself in this manner." (AR 42.) The Agency explained: "Many functions that were previously performed by a fulltime staff devoted to a single discipline are now done by an individual with many such assignments, done by a staff at a Service Unit, or not done at all." *Id.*

The ALJ did not address the shortage of funds issue, instead premising the holding on "preponderant evidence that the CHSO duties were insufficient to justify a fulltime CHSO . . . ." (AR 820.) Accordingly, the court cannot and need not review the sufficiency of the ALJ's conclusion. Because the RIF was adequately justified by insufficient work to require an FTE, the ALJ's decision is sound and this court affirms that decision.

II.    Discrimination Claims

Each of Tallacus's discrimination claims is premised on the basis that, after his position was eliminated, his duties were distributed to people outside of his protected class. For purposes of this discussion, it is helpful to review the identities and characteristics of those people. Tallacus himself

is a sixty-two year old male. Dye is male and approximately the same age as Tallacus; Battece is

male, younger than Tallacus; Tom is female and approximately the same age as Tallacus; Biery is

a thirty-four year old female.

> Chapter 42 of the United States Code, section 2000e-3 states, in relevant part:
>
> > It shall be an unlawful employment practice for an employer to discriminate against
> > any of his employees or applicants for employment . . . because he has opposed any
> > practice made an unlawful employment practice by [Title VII], or because he has
> > made a charge, testified, assisted, or participated in any manner in an investigation,
> > proceeding, or hearing under [Title VII].

42 USCS § 2000e-3. This provision of Title VII "protects the right to be free from certain types of

forbidden discrimination, as well as the right to speak out against such discrimination. It also

protects against retaliation for the exercise of the right to speak out against discrimination."

*Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003).

Tallacus's discrimination claims are governed by the *McDonnell Douglas* burden-shifting

framework. "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII

must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that

(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an

adverse employment action; and (4) similarly situated individuals outside his protected class were

treated more favorably." *Chuang v. Univ. of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)

(internal citation omitted). "The requisite degree of proof necessary to establish a *prima facie* case

for a Title VII claim on summary judgment 'is minimal and does not even need to rise to the level

of a preponderance of the evidence.'" *McNack v. Warren*, Civil No. 99-1211-KI, 2000 U.S. Dist.

LEXIS 14381, at *13 (D. Or. Sept. 29, 2000) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889

(9th Cir. 1994)). "The plaintiff need only offer evidence which 'gives rise to an inference of

unlawful discrimination.'" *Wallis*, 26 F.3d at 889 (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985)).

Once a plaintiff has made his prima facie showing of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. *See also Knox*, 543 F. Supp. 2d at 1247 ("If plaintiff makes a prima facie case, the burden of production then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action." (citing *Chaung v. Univ. of Cal.*, 225 F.3d 1115, 1123-1124 (9th Cir. 2000))). If the defendant successfully gives such a reason for the employment action, the plaintiff must then demonstrate that the proffered reason is pretextual. *Chaung*, 225 F.3d at 1124. Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the defendant." *White v. TA Operating Corp.*, 2008 U.S. Dist. LEXIS 48103, at *8-9 (D. Or. June 19, 2008) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

### A.    Gender Discrimination

Defendant concedes that Tallacus has satisfied the first three prongs of the prima facie analysis for this claim. Therefore, Tallacus need only show that a similarly situated woman was treated more favorably than he was. Tallacus argues that the bulk of his former duties have been assigned to two female employees of IHS, Tom and Biery. In her deposition, Tom testified that she initially spent approximately fifty- to sixty-percent of her day performing CHS functions. (Tallacus Decl., Tom Depo. at 9:21-10:9.) In a subsequent declaration, Tom stated that she spends at least

eighty-five percent of her time on CHS duties "on a regular basis." (Tom Supp. Decl. 3.) Tom also stated that Biery performs approximately ten percent of the CHS duties. *Id.* at 4. Tallacus also argues that Biery was hired as a result of Tom taking over some of Tallacus's CHS duties and, thus, but for the RIF that eliminated his position, Biery would not have been hired. As noted above, Tom and Biery are female.

Defendant argues that this evidence fails to establish that similarly situated women were treated more favorably. First, Tallacus provides no evidence that the decision to conduct the RIF was based on gender. Second, Tallacus does not provide examples of women that are actually similarly situated to himself. Tom and Biery work in a different division of IHS, the Business Office. Neither of them were potentially subject to an RIF premised on a lack of work in CHS. Third, no one was hired to replace Tallacus in CHS, let alone a female. Third, although Biery was hired after the RIF, she was hired in an information technology position and was not supposed to be performing CHS duties, but was pressed into service as a result of a high volume of work in the Business Office. Fourth, both men and women have taken over CHS duties since the RIF. Finally, that Tom and Biery currently perform Tallacus's old duties is not evidence of that females have been treated more favorably than males.

Defendant is correct. Tallacus simply cannot show that a similarly situated female was treated more favorably because there was no similarly situated female at the time of the RIF. It is true that the majority of his former tasks ended up on the desks of two other female employees. However, to characterize this as favorable treatment misses the point. If Tom or Biery had retained their jobs as a result of Tallacus's RIF, then it could be argued that they received favorable treatment. In this case, however, the RIF was specific to CHS because of the shrinking number of tribes electing

to administer a CHS program internally, resulting in a lack of work sufficient to justify an FTE in CHS.    It follows that the only employees that could have benefitted from gender based discrimination, with respect to the RIF, would be female employees of CHS. Tom and Biery were not employees of CHS and did not benefit from the elimination of Tallacus's position at CHS. Accordingly, Defendant's motion as to the gender discrimination claim is granted.

### B.    Age Discrimination

Tallacus's age discrimination claim follows much the same analytical path as his claim for gender discrimination. Tallacus cannot show that a similarly situated but younger person received a benefit from Tallacus's position being eliminated. Again, the alleged benefit was receiving more work as a result of Tallacus's departure from CHS. Furthermore, the person who, according to Tallacus, performs the bulk of his old duties is approximately the same age as he is. For the above reasons, Defendant's motion as to the age discrimination claim is granted.

### C.    Disability Discrimination

The American with Disabilities Act of 1990 ("the ADA"), 42 U.S.C. §12201, prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a) (2010). The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); 29 C.F.R. §1630.2(m).    In order to prevail on an employment termination claim under the ADA, a plaintiff must establish that: (1) she is a disabled

person within the meaning of the ADA; (2) she is qualified, that is, with or without reasonable accommodation (which she must describe), she is able to perform the essential functions of the job; and (3) the employer terminated her because of her disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

Tallacus argues that his retaliation claim subsumes the disability claim, that is, his disability gave rise to the 2000 settlement agreement which caused Wilder to resent him and, ultimately, eliminate his position for illegitimate reasons. Defendant argues that this reasoning lacks support and is circular. The court agrees that Tallacus must prove his prima facie case of discrimination based on disability without relying on the theory of retaliation. If Tallacus was, indeed, retaliated against for engaging in protected activity, proper redress is through a retaliation claim. If he was discriminated against for his disability, he must prove that the RIF was a result of his disability, not his protected activity.

That said, Tallacus fails to meet his prima facie burden as to this claim. Defendant concedes that Tallacus satisfies the first two prima facie elements, but argues that he has not presented evidence that his termination resulted from discrimination based on his disability. Tallacus argues that Wilder's testimony demonstrates discrimination. When asked if she knew that Tallacus was disabled, she testified that she "only knew that he'd had injuries and knee surgeries at various points." (AR 554.) She also mentioned that IHS provided him a parking spot because he had "difficulty walking." *Id.* In addition, prior to the RIF, Wilder investigated Tallacus's use of sick leave and annual leave.

This evidence is insufficient to suggest that Tallacus's position was eliminated because of discriminatory animus based on disability. Tallacus does not dispute the testimony of Wilder that

OPINION AND ORDER                    23                    {KPR}

she requested a report on Tallacus's leave *after* the RIF occurred, nor does he dispute that Wilder reviews the leave used by all employees that she supervises. (AR 636-637.) While the fact that Wilder did not characterize Tallacus's position as a disability, yet recognized that he had physical limitations, suggests a potentially dismissive attitude toward his disability, it alone cannot justify the inference that Tallacus's position was eliminated because of discriminatory animus. Therefore, Defendant's motion as to disability discrimination is granted.

3.    Retaliation Claim

The *McDonnell Douglas* framework also governs retaliation claims arising under Title VII. *See Bergene v. Salt River Project Agricultural Improvement & Power District*, 272 F.3d 1136, 1140 (9th Cir. 2001) ("We apply a system of shifting burdens in Title VII discrimination and retaliation cases." (citing *McDonnell Douglas*, 411 U.S. at 802-803)). "A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Jamal v. Wilshire Management Leasing Corp.*, 320 F. Supp. 2d 1060, 1078 (D. Or. 2004) (citing *Bergene v. Salt River Proejct Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001)). "If the plaintiff establishes a *prima facie* case, 'the *McDonnell Douglas*' order and allocation of proof that governs disparate treatment claims also governs retaliation claims.'" *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp. 2d 1136, 1144 (D. Or. Jan. 29, 2007) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), *cert. denied* 498 U.S. 939 (1990)).

Again, Defendant concedes that Tallacus meets the first two prongs of this test. Defendant contends, however, that Tallacus cannot establish a causal connection between the protected conduct,

OPINION AND ORDER                          24                          {KPR}

bringing a claim against IHS and subsequently entering into the 2000 settlement agreement, and the

adverse employment action, the elimination of his position via an RIF in 2007. Tallacus argues that

there is no set time limit that breaks the chain of causation and, further, that there is additional

evidence that overcomes the seven-year gap between the settlement of his lawsuit and the allegedly

retaliatory RIF.

The Ninth Circuit has declined to establish a bright-line rule with respect to the time between

protected activity and adverse action:

> There is no set time beyond which acts cannot support an inference of retaliation, and
> there is no set time within which acts necessarily support an inference of retaliation.
> Whether an adverse employment action is intended to be retaliatory is a question of
> fact that must be decided in the light of the timing and the surrounding
> circumstances. In some cases, the totality of the facts may form such a clear picture
> that a district court would be justified in granting summary judgment, either for or
> against a plaintiff, on the issue of retaliatory motive; but the length of time,
> considered without regard to its factual setting, is not enough by itself to justify a
> grant of summary judgment.

*Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

Tallacus argues that Wilder revealed her feelings about the settlement agreement at the time

it was entered into. Wilder stated in her testimony at the administrative hearing:

> You know, basically we had reached an agreement where he was going to receive a
> sum of money that would have otherwise provided healthcare to Indian people and
> I'm Indian and I worked my whole career for that, and I wanted to make sure that he
> understood that I hope that he was going to [do] something good for the Agency that
> would make sure that that money was well spent.

(AR 567.) At the time of the settlement agreement, Wilder mentioned to Tallacus that he might be

subject to an RIF in the future because of the increasing number of tribes opting to internalize their

CHS program. Tallacus interpreted this statement as a threat. In 2003, Wilder again commented to

Tallacus that he may be subject to an RIF in the future. (AR 727.) In 2005, Tallacus saw his name

on an executive committee agenda which indicated that an RIF of his position would be discussed. (AR 729-730.) Tallacus testified that these three incidents made him feel that he was perpetually in danger of being subject to an RIF.  (AR 731.)

This evidence is sufficient to meet Tallacus's prima facie burden.  Wilder's own testimony reveals that, at the very least, she felt that Tallacus's settlement was depriving the population served by IHS of health care and that Tallacus would need to work hard to compensate for this.  Also, as described in the disability discrimination section, Wilder testified somewhat dismissively about Tallacus's disability, which suggests further that she believed the settlement agreement was unnecessary, excessive, or even illegitimate.  Taken together, a reasonable jury could conclude that Wilder harbored a grudge against Tallacus that caused her to pursue an RIF that was not strictly necessary.

Defendant proffers as its legitimate nondiscriminatory reasons a lack of work and shortage of funds, the reasons originally given to justify the RIF.  It bears noting that in establishing a genuine issue of material fact as to whether the proffered reason is pretextual, Tallacus "may rely on the same evidence they used to establish a prima facie case or put forth additional evidence." *Coleman v. The Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).  The court finds that the evidence for his prima facie burden is sufficiently strong to create a reasonable inference that the reason given for the adverse action was pretextual.  Wilder, a supervisor, expressed a strong and admittedly emotional response to the settlement agreement.  Her response was particularly intense because she felt that, not only was Tallacus receiving a large sum of money, he was in effect depriving those in need of those funds.  The court acknowledges that seven years is a long period of time in the context of a retaliation claim.  That said, this is an issue that hinges on facts and credibility and the court cannot

OPINION AND ORDER                         26                              {KPR}

conclude that a reasonable jury could not find for Tallacus on his retaliation claim. Accordingly,

Defendant's motion as to this claim is denied.

III.    Breach of Contract

Defendant moves to dismiss Tallacus's breach of contract claim for lack of subject matter

jurisdiction. Defendant claims that the court lacks jurisdiction under the Tucker Act.

> The Tucker Act plainly gives district courts jurisdiction over claims against the
> United States for money damages of less than $10,000 that are "founded . . . upon the
> Constitution." But the Act has long been construed as authorizing only actions for
> money judgments and not suits for equitable relief against the United States. The
> reason for the distinction flows from the fact that the Court of Claims has no power
> to grant equitable relief and the jurisdiction of the district courts under the Act was
> expressly made "concurrent with the Court of Claims."

*Richardson v. Morris*, 409 U.S. 464, 465-66 (1973) (quoting the Tucker Act, 28 U.S.C. § 403(a)).

Defendant argues that because Tallacus seeks equitable relief in the form of reinstatement under the

terms of the agreement, the court lacks subject matter jurisdiction.

Defendant is correct. The complaint reads: "The settlement remedy was part of a resolution

of a Title VII or Rehabilitation Act claims, and this court should require the Agency to restore the

benefits it agreed to provide Tallacus under the settlement agreement." (Complaint 10.) Tallacus

seeks equitable relief and, thus, this court lacks subject matter jurisdiction to hear this claim.

Accordingly, Defendant's motion to dismiss is granted.

*Conclusion*

For the reasons above stated, the MPBS decision is upheld, Defendant's Motion for Summary

Judgment (#35) is GRANTED as to gender, age, and disability discrimination, Defendant's Motion

for Summary Judgment (#35) as to retaliation is DENIED, and Defendant's Motion to Dismiss for

Lack of Subject Matter Jurisdiction (#35) is GRANTED. Defendant's Motion to Strike the

Deposition of Phil Fritz (#49) is GRANTED. Plaintiff's Motion to Strike Factual Background (#40) is DENIED.

DATED this 15th day of April, 2010.

JOHN V. ACOSTA
United States Magistrate Judge