IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LARRY D. TALLACUS, | Civ. No. 08-591-AC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| KATHLEEN SEBELIUS, Secretary,<br>Department of Health and Human Services, | |
| Defendant. | |

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Larry D. Tallacus's ("Tallacus") retaliation claim under 42 U.S.C. § 2000e, et seq., alleging retaliation in his employment due to prior protected activity, was tried to a jury. The jury

OPINION AND ORDER         1         {KPR}

returned a verdict against Tallacus and in favor of Defendant Kathleen Sebelius, Secretary of the Department of Health and Human Services ("DHS"). Tallacus now moves for a new trial, arguing that the court committed legal error in excluding certain evidence; that the court gave an erroneous limiting instruction; and that the jury's verdict for DHS was against the clear weight of the evidence.

*Background*

Tallacus was an employee of Indian Health Services ("IHS"), a department of DHS. In 2000, Tallacus and IHS reached an agreement in settlement of claims Tallacus brought against the agency regarding employment discrimination. In 2007, Tallacus's position was the subject of a reduction in force ("RIF") and Tallacus was transferred to a different position within IHS. Tallacus subsequently filed claims against IHS arguing essentially that the RIF was the result of discrimination based on gender, age, and disability, and in retaliation for his earlier claims against IHS and subsequent settlement. The court dismissed the discrimination claim and the parties went to trial on the retaliation claim.

A pretrial conference was held on March 9, 2011. A lengthy discussion occurred concerning the appropriate time period from which evidence of retaliation should be admitted. Tallacus argued that the timing of his 2010 reinstatement coupled with the timing of filing his claim in the Court of Federal Claims were relevant to the alleged retaliation in 2007. DHS argued that allowing evidence pertaining to the 2010 reinstatement would put irrelevant evidence before the jury and would confuse them as to their ultimate task, determining whether the 2007 RIF was retaliatory. The court stated with respect to evidence from 2010, that it would "specifically exclude evidence pertaining to 2010 workloads, and exclude that evidence in its entirety, and relatedly exclude Exhibit 30 because it pertains to the 2010 workload issue." (Docket #112 at 48.) The court stated that it would permit

Tallacus to testify that he currently held the position from which he had been removed in 2007, but would not allow either side to give further explanation as to why Tallacus had been reassigned to his original position. The court also excluded Exhibit 31 on the same theory as Exhibit 30. *Id.* at 112. The court stated that the absence of further evidence about the 2010 reinstatement would be addressed in a limiting instruction.

*Legal Standard*

Under Federal Rule of Civil Procedure ("Rule") 59, the court may grant a new trial on all or some of the issues tried to a jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" FED. R. CIV. P. 59(a)(1). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted . . . ." *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those grounds that have been historically recognized." *Id.* Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940).

A new trial is warranted on the basis of an incorrect evidentiary ruling only "if the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land,* 970 F.2d 651, 658 (9th Cir. 1992). Harmless error in an evidentiary ruling does not justify a new trial. *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1439 (9th Cir. 1990). In order to establish reversible error, the complaining party must establish that the error was prejudicial, which means that the trial court's error more probably than not tainted the jury's verdict. *Engquist,* 478 F.3d at 1009. A district court's evidentiary rulings are subject to the abuse of discretion standard. *Engquist v. Or. Dep't of Agric.,*

478 F.3d 985, 1008 (9th Cir. 2007), *aff'd,* 128 S. Ct. 2146 (2008).

The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n.15 (9th Cir. 2000). This is true even if a verdict is otherwise supported by substantial evidence. *Silver Sage Partners Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 819 (9th Cir. 2001). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Molski v. M. J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)). Unlike a motion for judgment as a matter of law, "[t]he court may weigh the evidence, may evaluate the credibility of the witnesses, and is not required to view the evidence from the perspective of the prevailing party." *Paul v. Asbury Automotive Group, LLC*, Civil No. 06-1603-KI, 2009 WL 188592, at *1 (D. Or. Jan. 23, 2009) (citing *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000)).

*Discussion*

I.  Evidentiary Rulings

Plaintiff argues generally that the court erred in "drawing a line" and excluding evidence that emerged subsequent to the events surrounding the 2007 RIF. In doing so, Tallacus argues, the court prevented him from proving that DHS's proffered reasons for the RIF were pretextual. Tallacus also argues that the court's rulings were inconsistent in that it excluded evidence about the position created in 2010, yet admitted evidence relevant to the 2009 budget, which is beyond the period of

time the court otherwise ruled was relevant to the claim at issue in the present case. Adding insult to injury, Tallacus alleges, the court also limited him in his ability to ask about the 2009 budget evidence.

Tallacus objects specifically to the exclusion of Exhibit 30, the 2010 Position Description ("PD"), and Exhibit 31, the comparison of the 2009 and 2010 CHEF payments. According to Tallacus, the 2010 PD demonstrates that the description of his position in 2010 was not materially different from the position from which he was RIF'd in 2007. He contends that this undermines one of DHS's claimed reasons for eliminating his former position, that there was not sufficient work relevant to the position to justify its continuation. The 2010 PD reveals that the new position was full-time, like the 2007 position Tallacus formerly occupied, and is essentially the same position that was subject to a RIF in 2007. Tallacus also argues that in excluding the 2010 PD, the court implicitly ruled that he could not question Andrew as to the content of the PD or whether it was a full-time position.

Tallacus also argues that the exclusion of Exhibit 31 was erroneous. Tallacus sought to admit this exhibit in order to introduce Andrew's statement that Tallacus brought in $2 million more than his temporary replacements. Tallacus maintains that this evidence rebuts both the "lack of work" and "lack of funds" rationales given by DHS for the RIF of his position. He argues that his success upon being reinstated to a position substantially similar to his previous position demonstrates that there was sufficient work for the position and, even assuming there was not enough work, that DHS could have maintained a sufficient workload by shifting duties from the finance department back in 2007. This would have bolstered his claim that the motive for the RIF was retaliation.

DHS argues that the rulings themselves were not erroneous and, even if they were, they were

equally prejudicial to both sides.  Regarding the appropriateness of the rulings, DHS argues that it was within the court's broad discretion to limit evidence to the events surrounding the 2007 RIF in order to answer the core question:  was the 2007 RIF in retaliation for the 2000 settlement agreement?  According to DHS, the court's ruling was appropriate in order to maintain the focus of the proceeding, avoid juror confusion, admit relevant evidence, and permit the admission of probative evidence except to the extent that it would be unduly prejudicial.

DHS also argues that the admission of evidence regarding the events of 2010 and exhibits related to the 2010 position would have prejudiced both parties, and likely would have been more prejudicial to DHS than to Tallacus.  In fact, DHS asserts, the only evidence the jury ultimately heard about 2010 was that Tallacus had been reassigned to his previous position, and DHS was not permitted to present a rationale for this, a situation more damaging to DHS than to Tallacus.

A district court is "granted broad discretion in admitting evidence," and "[a] new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party."  *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (citations omitted).  Thus, the evidentiary ruling must be both incorrect under the law and harmful to the party seeking a new trial.

The court is not persuaded by Tallacus's assertion that its evidentiary rulings were both incorrect and unduly prejudicial.  First, Tallacus has not established that the court's evidentiary rulings were legally incorrect.  The court is tasked with weighing evidence to determine whether its relevance is outweighed by its prejudicial effect, or vice versa.  Here, the court concluded that admission of the 2010 evidence was not sufficiently relevant to outweigh its potential negative effects.  These effects included confusing the jury and opening the door to a vast amount of irrelevant evidence.  The court's ruling focused the jury on the specific issue raised by the complaint

– whether DHS retaliated against Tallacus in 2007 for his prior complaints against DHS which resulted in a settlement agreement in 2000. The court determined that evidence of Tallacus's subsequent reinstatement was insufficiently probative of DHS's motives in 2007, when Tallacus was subject to the RIF that occurred almost three years prior to his reinstatement. Finally, the court notes that the jury was informed that Tallacus had been reassigned to his previous position, which permitted the jury to draw the primary inference that Tallacus sought to establish, namely that the fact of his reinstatement corroborated his claim that his earlier termination was somehow improper. For these reasons, the court concludes that the evidentiary rulings in question were neither incorrect nor prejudicial to Tallacus and thus do not justify a new trial.

II.     Limiting Instruction

In its instructions to the jury, the court gave the following limiting instruction:

> You have heard evidence regarding other claims that Mr. Tallacus is pursuing against Indian Health Service relating to his employment. This includes testimony regarding a lawsuit alleging that the 2007 RIF constituted a breach of the 2000 settlement agreement between the parties. It also includes testimony that Mr. Tallacus was reassigned to his former CHS duties in July 2010. The parties disagree as to the reasons for Mr. Tallacus's reassignment in July 2010, and Mr. Tallacus is pursuing a separate claim against the agency relating to that reassignment. You have heard the evidence regarding these other claims in order to provide you with background and context for Mr. Tallacus's retaliation claim in this case. The issue before you in this case is limited to the issue of whether the RIF of Mr. Tallacus's position in 2007 constituted unlawful retaliation for his prior protected activity. In reaching your verdict on this retaliation claim, you must not consider whether you believe that the 2007 RIF was a breach of the 2000 settlement agreement. You must also not consider the reasons Mr. Tallacus is pursuing that new claim relating to his 2010 reassignment or the reasons IHS reassigned him.

(Docket #109 at 21.)

Tallacus contends that this instruction was erroneous and his reasons fall into two categories. First, Tallacus argues that the instruction was confusing for several reasons: the jury heard no

evidence on Tallacus's other claims against DHS but they were referenced in the limiting instruction; the jury received a copy of the settlement agreement but was also instructed to ignore it by the limiting instruction; and the jury was informed of the 2010 reassignment but was not provided an explanation for the reassignment, inviting speculation. Second, Tallacus argues that the jury should have been permitted to consider both whether the RIF breached the settlement agreement and why Tallacus was reinstated to the very same position for which there was previously an RIF. In fact, Tallacus argues, the limiting instruction prevented the jury from considering the adverse actions against him upon which his retaliation claim is based. It also prevented him from presenting precisely the kind of circumstantial evidence that a plaintiff typically must rely on to establish pretext. Tallacus also states that the breach of the settlement agreement and the retaliation were one and the same and cannot be separated, and the jury should not have been expected to ignore the issue.

DHS argues that Tallacus waived his right to object to this instruction by not doing so during the pretrial conference or the discussions with the court during trial. It argues that, even if the objection was not waived, the court did not err because it properly stated the elements of the claim, noting that failure to correctly state the elements is the sole basis for granting a new trial for erroneous jury instructions. And, generally, DHS argues that rather than confuse the jury, as Tallacus suggests, the limiting instruction properly focused the jury on the question of retaliation.

A court's instructions to the jury will be upheld unless they "misstate the law[.]" *Ostad v. Oregon Health Sciences University*, F.3d 876, 885 (9th Cir. 2003) (finding that issuing an instruction that is a correct statement of the law is not an abuse of the district court's discretion). Here, as DHS points out, there was not a dispute as to the elements of a retaliation claim. Rather, Tallacus's

objections to this instruction are that it both confused the jury and prohibited the jury from considering the evidence that would give rise to an inference of retaliation. Tallacus is objecting not to an error in stating the law, but the court's underlying decisions regarding what evidence is admitted and the scope of the presentation at trial. These concerns are addressed in the context of evidentiary objections which were resolved above.

The court also rejects this argument as waived for failure to object to the limiting instruction prior to the instruction being given by the court. Rule 51 provides that "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). In general, such instruction is timely if made prior to discharge of the jury.[1] FED. R. CIV. P. 51(c)(2)(A). Tallacus, having knowledge of the court's intention to give this instruction in advance, did not object to this instruction in a timely fashion, pursuant to Rule 51, and this argument was therefore waived. For this additional reason the court denies Tallacus's motion on this ground.

III.   Perjury

The Supreme Court defines perjury as giving "testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Perjury will necessitate a new trial where there is a "reasonable probability" that "the result of the proceeding would have been different." *United States v. Sanchez*, 379 Fed. Appx. 551, 554 (9th Cir. 2010). In *Sanchez*, the perjury was revealed by new evidence and the court framed the standard as such, i.e., that

---

[1] If a party is not aware of an instruction until after it is given, it may object promptly upon knowledge of the instruction. FED. R. CIV. P. 51(c)(2)(B).

introduction of new evidence raised the reasonable probability of a different result.  Though the posture here is slightly different the analysis of this claim is the same.

Tallacus argues that a portion of Rita Dotomain's ("Dotomain") testimony was inconsistent with prior statements and, thus, amounts to perjury.[2]  In particular, Tallacus notes that contrary to her testimony before the Merit Systems Protection Board, Dotomain testified at trial that Wilder did not bring a copy of the settlement agreement to the 2007 RIF meeting with Tallacus.  Tallacus quotes the following testimony from the third day of trial, when his counsel was questioning Dotomain:

Q   Now, on August 30, 2007, did you see the settlement agreement?

A   No.

Q   How do you know that Ms. Wilder had it with her in that conference room?

A   She said she left it in her office.

(Docket #125 at 47.)  Tallacus argues that this was an intentional misrepresentation.  He also notes that it is contrary to the Wilder's witness statement.  According to Tallacus, this misrepresentation was material because it could have undermined Tallacus's own testimony that Wilder not only had the document at the meeting, but that at one point during the meeting she held it up for emphasis.  He argues that this statement was unfairly prejudicial, in part because Dotomain was only supposed to testify about the mechanics of an RIF and this inconsistent testimony came as a surprise.

DHS argues that Tallacus has not met his burden to prove that Dotomain perjured herself or that, if she did so, it was material or prejudicial.  DHS argues that there was no actual discrepancy between the trial testimony and Dotomain's prior statement; Dotomain testified that she did not see

---

[2] Tallacus also objects to Dotomain's testimony about RIFs in Alaska as not contained in the witness statement and potentially confusing to the jury.  The court notes that Tallacus did not object to this testimony at the time, thus waiving the current objection.

OPINION AND ORDER                           10                           {KPR}

the document at the RIF meeting, which is not the same as testifying that the document was not in Wilder's possession at the meeting. DHS then argues that even if there was a discrepancy in Dotomain's various testimonies, there was no dispute between the parties as to whether Wilder brought the settlement agreement to the RIF meeting, so the alleged discrepancy was immaterial. DHS points out that it would not have made sense for Dotomain to intentionally misrepresent herself on this minor and essentially conceded point, particularly where such misrepresentation would contradict the testimony of a fellow witness. Finally, DHS argues, if Dotomain's testimony was not credible, Tallacus should have impeached her at trial.

The court agrees with Tallacus that the above-quoted testimony is inconsistent with Dotomain's prior testimony in that she not only stated that she did not see the agreement, but stated also that the agreement was in Wilder's office, and therefore not at the meeting. However, this discrepancy was neither material nor outcome determinative. DHS did not dispute at trial that the 2000 settlement agreement was discussed at the RIF meeting. This key fact was admitted at trial and any question as to whether Wilder had the settlement agreement in her possession at the meeting was of less import and cumulative of the larger point: Wilder mentioned Tallacus's 2000 settlement agreement at their meeting about his RIF.

Tallacus also argues that Dotomain's testimony undermined the credibility of his testimony to the contrary. Tallacus's argument fails. First, if Dotomain's testimony was clearly inconsistent and harmful to Tallacus's credibility, he should have objected to this testimony at trial, rather than after the fact. Indeed, the testimony was elicited on cross-examination by Tallacus's counsel, who failed to either object to the statement or use it to impeach Dotomain's credibility. Second, to the extent that Dotomain's testimony was confusing and inconsistent, it was more likely to undermine

DHS's case and the credibility of its witnesses as two of these witnesses presented inconsistent accounts of the RIF meeting.

In conclusion, the challenged testimony does not meet the standard for perjury, and even if it did, it was not sufficiently material or outcome-determinative to justify a new trial.

IV.    Clear Weight of the Evidence

Tallacus argues that the court should grant a new trial as the present verdict was contrary to the clear weight of the evidence. Tallacus argues that the clear weight of evidence shows that the proffered reasons for the RIF, lack of work and funds, were pretextual and that both proved at trial such that, in exercising its "conscientious opinion," the court must grant Tallacus's motion for a new trial. Notably, this determination is based on the evidence adduced at trial and not the evidence the movant contends should have been admitted at trial, but was not. Rather, the court must consider whether, in light of the evidence before it, the jury's verdict was obviously incorrect.

    A.    *Lack of work*

Tallacus argues that the clear weight of the evidence supports his contention that a lack of work at IHS was merely a pretext for eliminating his position, and instead it was eliminated as retaliation for past protected activity. Tallacus presents the following evidence in support of this contention: Tallacus's testimony that his position was full-time until IHS began transferring his duties to others; that no workload study was ever performed; the fact that Andrew, his immediate supervisor, did not provide any information about Tallacus's workload or participate whatsoever in the decision to issue an RIF and found out about the RIF at the same time as Tallacus; and the fact that certain of his duties were transferred to another unit in an expedited fashion, immediately prior to his RIF.

DHS responds that Tallacus simply failed to establish intentional retaliation as the true reason for his RIF. With respect to lack of work, DHS argues that it produced ample evidence that IHS's workload decreased as tribes took over operation of their health programs and that no study was needed to establish this well-known fact. According to DHS, the only evidence to the contrary came from Tallacus himself, and the jury was permitted to give as much or as little weight to his testimony.

The court, having weighed the evidence adduced at trial, concludes that the jury's finding on this point was not contrary to the clear weight of the evidence. Both sides presented evidence in support of their theories, Tallacus that his position was intentionally dismantled and redistributed to other employees, and DHS that, as tribes took over their health programs, the duties making up Tallacus's position decreased such that his position was no longer justified. The court does not find DHS's position unsupported by evidence or otherwise not credible and, thus, will not disturb the jury's finding in DHS's favor.

  B. *Lack of funds*

Tallacus also argues that the other proffered reason for the RIF, lack of funds, was a pretext for DHS's retaliation. He offers the following as support for this position: IHS, despite budget shortfalls, continued to increase salaries and fill additional positions; other staff members began taking over Tallacus's CHS duties, including those at higher grades of pay; Tallacus was the only IHS employee who was subject to an RIF in the Portland region, a reduction which was out of proportion to the claimed budget shortfall; Imholt's chart and testimony showed that CHS functions extended beyond the five tribes whose clinics were staffed by federal workers; Biery was hired as an IT specialist in 2007, but also took on CHS duties; and Wilder was unable to explain why

Tallacus was RIF'd, as opposed to employees at the clinics where the budget shortfalls originated.

With respect to a lack of funds, DHS responds that in moving Tallacus into a position in finance and distributing this CHS duties to other employees, IHS was able to eliminate an entire position with attendant savings. DHS points out that Tallacus challenged the claimed cost savings at trial, but was apparently unable to persuade the jury.

The court agrees that the jury's verdict was not contrary to the clear weight of the evidence. Tallacus presented his theory that, in eliminating his position, IHS did not save money and, in fact, it continued to increase its expenditures around the same time as Tallacus's RIF. DHS argued that its decisions with respect were, in fact, cost-effective. In the court's view, the evidence adduced by Tallacus did not demonstrate that DHS's theory was obviously false, and the jury could properly conclude that, as DHS contended, Tallacus's RIF was motivated by a lack of funds. The court will not disturb the jury's finding as it is not contrary to the clear weight of the evidence.

    C.    *Direct Evidence of Wilder's Retaliation*

Tallacus argues that there was direct evidence of retaliation by Doni Wilder ("Wilder"). Tallacus cites Wilder's admission that she brought the settlement agreement to his RIF meeting; her inconsistent testimony regarding whether she believed Tallacus was disabled; evidence that Wilder thought the benefits Tallacus received in the 2000 settlement illegitimate; her testimony that she was personally offended that Tallacus received a substantial settlement out of funds that would have otherwise gone directly to Indian tribes; and the fact that Wilder held a grudge against Tallacus. DHS responds that there was sufficient evidence to allow the jury to conclude that Wilder did not retaliate against Tallacus: Wilder gave legitimate reasons for the RIF which were corroborated; other witnesses testified that she did not bear a grudge against Tallacus; evidence was presented of efforts

to manage the budget prior to issuing the RIF; and Wilder's own testimony clarifying her comments at the RIF meeting. At DHS puts it, the jury was permitted to find Wilder credible, and it did.

Again, having observed presentation of evidence by both sides regarding Wilder's alleged retaliation against Tallacus, the court concludes that the jury's determination was not contrary to the clear weight of the evidence. The evidence that supported a finding that Wilder retaliated, primarily her bringing the 2000 settlement agreement to the 2007 RIF and her admitted negative feelings about that settlement, was presented to the jury. DHS presented its own evidence that Wilder did not act in a retaliatory manner. The jury was persuaded by DHS's presentation and, in the court's view, its verdict was not contrary to the clear weight of the evidence.

## *Conclusion*

For the reasons above stated, Tallacus's motion for a new trial (#115) is DENIED.

IT IS SO ORDERED.

DATED this 9th day of December, 2011.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge